FILED

2008 Jul-17  AM 11:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

JUL 15 PM

U.S.
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| ASHLEY EDWARDS, an individual, ) ) ) | |
| Plaintiff, ) ) | CV-08-P-1246-S |
| v. ) ) | |
| NCO FINANCIAL SYSTEMS, INC., ) a Corporation, ) ) | |
| Defendant. ) | |

---

## NOTICE OF REMOVAL

---

NOW INTO COURT, through undersigned counsel, comes Defendant, NCO Financial Systems, Inc. ("NCO"), and hereby removes from the Circuit Court of Jefferson County, Alabama, the following described and captioned lawsuit, and respectfully shows:

1.   NCO is the only defendant in a civil action filed by Plaintiff Ashley Edwards in the Circuit Court of Jefferson County, Alabama, captioned as "Ashley Edwards, an individual v. NCO Financial Systems, Inc., a Corporation," Civil Action No. 01-CV-2008-901177.00 (hereinafter the "State Court Action").

2.    Pursuant to 28 U.S.C. §§ 1441 and 1446, NCO removes Plaintiff's State Court Action to this Court, which is the judicial district in which the State Court Action is pending.

3.    Plaintiff asserts claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (FDCPA), and under Alabama state law.

4.    Removal of Plaintiff's State Court Action is proper under 28 U.S.C. § 1441. If the State Court Action had originally been brought in this Court, this Court would have had original jurisdiction over Plaintiff's FDCPA claims per 28 U.S.C. § 1331 and 15 U.S.C. § 1692k, and it would have had supplemental jurisdiction over Plaintiff's state law claims per 28 U.S.C. § 1367.

5.    Original jurisdiction on the basis of federal question jurisdiction exists because Plaintiff asserts claims under the FDCPA.

6.    Pursuant to 28 U.S.C. § 1446(b), NCO has timely filed this Notice of Removal. Plaintiff's State Court Action complaint was served upon NCO on July 1, 2008. This Notice of Removal is filed within 30 days of NCO's receipt of the State Court Action complaint and is therefore timely filed pursuant to 28 U.S.C. § 1446(b).

7.    Pursuant to 28 U.S.C. § 1446(a), NCO attaches as <u>Exhibit A</u> to this Notice of Removal, and incorporates by reference, a copy of all process, pleadings, and orders served upon NCO in the State Court Action.

2

WHEREFORE, based upon this Court's federal question and supplemental jurisdiction, Defendant, NCO Financial Systems, Inc., respectfully requests that this case proceed in this Court, as an action properly removed from the Circuit Court of Jefferson County, Alabama.

Respectfully submitted,

Laura C. Nettles, Esq. (ASB-5805-S63L)
Dustin J. Kittle (ASB-8250-T68K)
Attorneys for Defendant,
NCO Financial Systems, Inc.

OF COUNSEL:

**LLOYD, GRAY & WHITEHEAD, P.C.**
2501 20th Place South, Suite 300
Birmingham, AL 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380
lnettles@lgwpc.com
dkittle@lgwpc.com

## CERTIFICATE OF SERVICE

I certify that on this 15th day of July, 2008, a copy of the foregoing was served upon the following parties via FedEx, properly addressed and postage prepaid to:

John G. Watts
Watts Law Group, P.C.
700 29th Street South, Suite 201
Birmingham, AL  35233

M. Stan Herring
M. Stan Herring, P.C.
 700 29th Street South, Suite 201
Birmingham, AL  35233

Of Counsel



**AlaFile E-Notice**

01-CV-2008-901177.00

To:  NCO FINANCIAL SYSTEMS, INC.
C/O THE CORPORATION CO
2000 INTERSTATE PARK DR
MONTGOMERY, AL 36109

# NOTICE OF ELECTRONIC FILING

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

#### ASHLEY EDWARDS v. NCO FINANCIAL SYSTEMS, INC.
#### 01-CV-2008-901177.00

The following complaint was FILED on 4/14/2008 7:23:37 PM

Notice Date:     4/14/2008 7:23:37 PM

**ANNE-MARIE ADAMS**
**CIRCUIT COURT CLERK**
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
BIRMINGHAM, AL 35203

205-325-5355
anne-marie.adams@alacourt.gov

Exhibit
A

| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | **SUMMONS**<br>- CIVIL - | **Case Number:**<br>01-CV-2008-901177.00 |
|---|---|---|

### IN THE CIVIL COURT OF JEFFERSON, ALABAMA
### ASHLEY EDWARDS v. NCO FINANCIAL SYSTEMS, INC.

NCO FINANCIAL SYSTEMS, INC., C/O THE CORPORATION CO 2000 INTERSTATE PARK DR, MONTGOMERY AL, 36109

**NOTICE TO** _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN WATTS

WHOSE ADDRESS IS P.O. Box 531168, BIRMINGHAM AL, 35253

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    ASHLEY EDWARDS
   pursuant to the Alabama Rules of the Civil Procedure

| 4/14/2008 7:23:37 PM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

| ☑ Certified mail is hereby requested | /s JOHN WATTS |
|---|---|
| | Plaintiffs/Attorney's Signature |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____         _____

Date                           Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>01-CV-200<br>Date of Filing:<br>04/14/2008 |  |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT OF JEFFERSON COUNTY, ALABAMA
### ASHLEY EDWARDS v. NCO FINANCIAL SYSTEMS, INC.

**First Plaintiff:** ☐ Business  ☑ Individual     **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☐ Other          ☐ Government  ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonnes
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☑ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture
   Appeal/Enforcement of Agency Subpoena/Petition to
   Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP-Contempt of Court
☐ CONT-Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND- Equity Non-Damages Actions/Declaratory
   Judgment/Injunction Election Contest/Quiet Title/Sale For
   Division
☐ CVUD-Eviction Appeal/Unlawfyul Detainer
☐ FORJ-Foreign Judgment
☐ FORF-Fruits of Crime Forfeiture
☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB-Protection From Abuse
☐ FELA-Railroad/Seaman (FELA)
☐ RPRO-Real Property
☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP-Workers' Compensation
☐ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ INITIAL FILING     A ☐ APPEAL FROM          O ☐ OTHER
                              DISTRICT COURT

           R ☐ REMANDED           T ☐ TRANSFERRED FROM
                              OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**     ☐ Yes  ☑ No

**RELIEF REQUESTED:**     ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   WAT056      4/14/2008 7:20:04 PM          /s JOHN WATTS

**MEDIATION REQUESTED:**     ☐ Yes  ☑ No  ☐ Undecided



ELECTRONICALLY FILED
4/14/2008 7:23 PM
CV-2008-901177
CIRCUIT COURT
JEFFERSON COUNTY
ANNE-MARIE ADAMS

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| ASHLEY EDWARDS, an individual, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )      **Civil Action Number:** ) |
| NCO FINANCIAL SYSTEMS, INC., a Corporation, | ) ) ) |
| Defendant. | ) |

### COMPLAINT

COMES NOW the Plaintiff, by and through counsel, in the above styled cause, and for her Complaint against the Defendant, NCO Financial Systems, Inc., states as follows:

### Parties

1.  The Plaintiff, Ashley Edwards ("Plaintiff" or "Edwards"), is a natural person who is a resident citizen of Alabama.

2.  Defendant, NCO Financial Systems, Inc. ("NCO" or "Defendant"), is a foreign company that engages in the collection of debts in this county.

### Factual Allegations

3.  Plaintiff filed bankruptcy and was discharged on January 3, 2007, with Defendant receiving a copy of the discharge order. The case number was 06-03473 and it was filed in the Northern District of Alabama Bankruptcy Court.

4.  Plaintiff had NCO accounts (account numbers 2027xxx, 2307xxx, and 2774xxx) which were listed on the first page of her Schedule F.

5.  NCO is listed on the credit matrix at the back of the bankruptcy petition.

6.  NCO received notice of the bankruptcy shortly after it was filed but made no objection to the discharging of the NCO obligation.

7.  On January 3, 2007, a Discharge Order was entered and the "Certificate of Service" shows that the Bankruptcy Court served a copy of the Discharge Order on January 5, 2007, to NCO.

8.  NCO has intentionally not reported to the CRAs that Plaintiff's accounts were included in bankruptcy and that they should have a zero balance.

9.  NCO has intentionally and maliciously refused to report the true balance to the CRAs when NCO knew that the debts were discharged in bankruptcy.

10. Despite the court order, NCO has continued to report Plaintiff Edward's accounts (2027xxx, 2307xxx, and 2774xxx) to two of the national consumer-reporting agencies ("CRAs") as having a current balances owed of approximately $403.00, $271.00, and $303.00, respectively, which is incorrect and false.

11. NCO has intentionally not reported to the CRAs that the accounts were included in bankruptcy and that they should have a zero balance.

12. NCO has intentionally and maliciously refused to report the true balance to the CRAs when NCO knew that the debts were discharged in bankruptcy.

13. The effect of these errors on Plaintiff's credit reports has been to negatively impact Plaintiff's credit report, credit worthiness, and Plaintiff's credit score.

14. Following the discharge, Defendant engaged in debt collection activity against Plaintiff by reporting to the CRAs that Plaintiff was still personally liable for the balances due on the accounts in question despite the fact that the accounts were discharged, which extinguished Defendant's right to collect the account and Plaintiff's legal obligation to

2

pay the accounts. Once Defendant received notice of the bankruptcy discharge and the resulting change in the legal status of the debts, the Defendant had a duty to report them as such.

15.    Despite the change in the legal status of the accounts, Defendant has continued to report, by at least written communications, to one or more CRAs that Plaintiff remains personally liable for current balances as reported by Defendant. Additionally, Defendant has stated that it retains the legal right to collect the debts. This is particularly egregious given the false accounts now being reported.

<b>FACTS - DAMAGES</b>

16.    The conduct of the Defendant has proximately caused Plaintiff past and future monetary loss, past and future damage to Plaintiff's credit and credit worthiness, past and future mental distress and emotional anguish and other damages that will be presented to the jury.

<b>FACTS – DEFENDANTS' KNOWLEDGE OF<br>THEIR WRONGFUL CONDUCT</b>

17.    Defendant knew and continues to know that a discharge order means the consumer no longer owes the debt and has no personal liability to Defendant for the discharged debt but Defendant has made a corporate decision to willfully and maliciously act contrary to its knowledge in its calculated decision to violate the requirements to properly report and update the Plaintiffs' accounts.

18.    These written statements sent by Defendant to one or more of the CRAs are incorrect, false, and defamatory because the alleged debts were discharged in bankruptcy which extinguished Plaintiffs' legal obligation to repay the debts and Defendant's right to collect the debts.

3

19.  Defendant is fully aware of how to report to the CRAs, that a debt has been discharged in
bankruptcy.  By reporting that Plaintiff continues to owe a balance to Defendant, the
Defendant is unambiguously stating that Plaintiff has a legal obligation to repay the debt.
A third party which obtains Plaintiff's credit reports will naturally either assume that
these pre-petition debts were reaffirmed in the bankruptcy and Plaintiff failed to pay the
debts after reaffirming them or that Defendant asserted a dischargeability complaint
against Plaintiff and prevailed.

20.  Defendant has intentionally not reported to the CRAs that the accounts were included in
bankruptcy and that they should have a zero balance.   When it received notice of
Plaintiff's discharge, the Defendant had an absolute duty under 15 U.S.C. § 1681s-2(a),
to report the accounts as "discharged [or included] in bankruptcy," report a zero balance
due and report the accounts as closed.

21.  The Defendant has willfully and maliciously failed to report the accounts as having a "0"
balance as required by 16 CFR § 607 (6), which states, "a consumer report may include
an account that was discharged in bankruptcy (as well as the bankruptcy itself), as long as
it reports a zero balance due to reflect the fact that the consumer is no longer liable for the
discharged debt."

22.  The Defendant has promised through its subscriber agreements or contracts with each
CRA to update accounts to make them accurate which includes accounts that have been
discharged in bankruptcy but the Defendant has willfully, maliciously, recklessly,
wantonly, and/or negligently failed to follow this requirement as well as the requirements
set forth under the Fair Credit Reporting Act (FCRA) and state law which has resulted in

4

the intended consequences of this false information remaining on Plaintiff's credit reports.

23.    In the context of parking an account, the Defendant has an obligation and duty under federal and state law to accurately report the balance and the Defendant willfully and maliciously refuse to obey federal and state law.

24.    Defendant has agreed to follow and understands it must follow the requirements of the FCRA including:

- 15 U.S.C. § 1681(a)(1)(a) which states:

"A person shall <u>not furnish</u> any information relating to a consumer to any consumer reporting agency if the person <u>knows or has reasonable cause to believe that the information is inaccurate.</u>"

- 15 U.S.C. § 1681(a)(1)(B) which states:

"A person shall <u>not furnish information</u> relating to a consumer to any consumer reporting agency if –
(i)     the person has been notified by the consumer[1], at the address specified by the person for such notices, that specific information is inaccurate; and
(ii)    the <u>information is, in fact, inaccurate.</u>"

- 15 U.S.C. § 1681(a)(2) which states:

" A person who –
(A)    regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and
(B)    <u>has furnished</u> to a consumer reporting agency information that the person <u>determines is not complete or accurate, shall promptly notify</u> the consumer reporting agency of that determination and provide to the agency <u>any corrections</u> to that information, or any additional information, that is <u>necessary to make the information</u> provided by the person to the agency <u>complete</u> and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate."

[Emphasis added].

---

[1] The notice here comes from the federal bankruptcy court relating directly to the consumer.

25.   All of the above has been maliciously, willfully, and recklessly violated by the reporting of a bogus account as described in this Complaint.

26.   Defendant has a duty under Alabama law to act reasonably under the circumstances.

27.   Defendant has violated this duty under Alabama law by failing to act reasonably under the circumstances which include, but are not limited[2] to, the following:

- Defendant previously reported a balance owed by Plaintiff;

- Defendant routinely updates credit reports;

- Defendant received notice of the Plaintiff's filing of a bankruptcy petition;

- Defendant failed to object to its debts being discharged;

- Defendant received notice the debts were discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the accounts were discharged;

- Defendant knows that leaving a balance on a discharged account will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows that failing to note the accounts as discharged will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge;

---

[2] Until discovery is completed, Plaintiff cannot know all the circumstances for Defendant.

- Defendant knows and has agreed in its subscriber agreement with each CRA that it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to update the accounts falsely;

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

28.     The Defendant has a policy and procedure to refuse to properly update credit reports of consumers, like the Plaintiff, who has discharged the debts.  The reason is to keep false information on the credit report.  The false information consists of a balance shown as owed (when Defendant has known since discharge that no balance is owed) and intentionally refusing to show a current status of "discharged in bankruptcy".

29.     Defendant updates many accounts each month with allegedly the correct information regarding the balance but have willfully and maliciously refused to do so with Plaintiff and with others who are similarly situated who have received a discharge order on each of Defendant's debts.

### FACTS – MOTIVE FOR WRONGFUL CONDUCT

30.     The Defendant has a policy to "park" their accounts on at least one of the consumer's credit reports.  This is a term in the industry for keeping a false balance (or false account) on the credit report so that the consumer will be forced to pay off the balances in order to obtain a refinancing, to qualify for a loan, or to increase the consumer's credit score from the artificially lowered score which directly resulted from each of the Defendants' intentional and malicious conduct.

7

31.   When the consumer who has discharged the debts pay the "parked" accounts, the Defendant claims that such payment was purely "voluntarily" or was to pay off a "moral obligation". The Defendant knows and intends that by willfully and maliciously parking the accounts on the credit report, illegal payment can be extorted from the group of consumers in the same position as Plaintiff.

32.   The Defendant knows that parking a balance will lead to false and defamatory information being published every time the Plaintiff's credit report is accessed and this is the malicious and intentional design behind each of the Defendant's actions with the goal to force the Plaintiff to pay on an account she does not owe.

33.   In order to provide background information on the practices of the credit industry related to the purchasing and collection of discharged debt (including collection by leaving false balances on credit reports – "parking") the Plaintiff refers this Honorable Court to the November 12, 2007, article "Prisoners of Debt" in Business Week. The url accessed on December 1, 2007, is http://www.businessweek.com/magazine/content/0746/b4058001.htm and for the Court's convenience, a "printer friendly" version is attached as Exhibit "A."

34.   Just one quote from the Business Week article sums up the problem facing discharged consumers such as Plaintiff:

The very existence of this marketplace confounds even some veterans in the bankruptcy field. During a preliminary hearing in New York in March, U.S. Bankruptcy Judge Robert Drain asked a lawyer for JPMorgan Chase (JPM) how the bank had managed to sell consumer credit-card debts that had been discharged. "I don't know who would buy a discharged account," the perplexed judge said.

"Happens all the time, your honor," the Chase lawyer, Thomas E. Stagg, responded.

Drain's confusion is understandable. Traditionally, discharged debt was seen as not worth the paper it's written on. Once a judge excuses some of a debtor's

8

obligations – part of the bankruptcy system's goal of granting a financial fresh start – that person has no legal duty to pay them. In fact, bankruptcy law prohibits efforts to collect discharged debt.

In the 1990s, businesses adept at tracking and trading consumer debt expanded their reach to dabble in accounts enmeshed in bankruptcy. That dabbling has grown into a robust market. Some of the trade in so-called bankruptcy paper involves debts that remain collectible. What's troubling is that the market now also includes billions in discharged debts, which ought to have no dollar value. Owners of canceled liabilities can revive their value in two main ways:  by directly pressuring consumers to cough up cash or by gaming the credit system, as allegedly happened in the Rathavongsa case.

[Emphasis added].

35. After a reasonable opportunity for discovery, Plaintiff asserts that the Defendant is fully aware that reporting an account as a "charge off" or a "balance due" or other similar derogatory notation or comment brings to bear the full coercive power to force a debtor to pay discharged debt or suffer very real consequences financially, to reputation and to their credit rating.

36. After a reasonable opportunity for discovery, Plaintiff will have evidentiary support to show that the FICO© scoring models continue to penalize the "debtors" such as Plaintiff for illegal and defamatory reporting such as the Defendant's reporting that is the subject of this complaint.

37. Had Defendant properly reported the debt as discharged, with a zero balance due, and listed the account as closed, Plaintiff would only have suffered the inherent negative effects of filing for bankruptcy. Because the Defendant elected to violate state and federal law, Plaintiff has suffered additional damages and harm from the Defendant's false allegations that Plaintiff is still personally liable for the debt.

38. As a natural consequence of Defendant reporting that the debtor is still personally liable on a pre-petition debt, potential lenders, landlords, insurance companies, utilities, and

9

potential employers who view the credit report often believe that the Plaintiffs have engaged in some sort of bad conduct as an explanation of why the debt was not discharged in bankruptcy.

39.     Multiple companies have reviewed Plaintiff's credit reports and have seen the false information listed on the accounts.

### FACTS – NOTICE TO DEFENDANT OF ITS WRONGFUL CONDUCT

40.     Despite receiving notice that the Defendant's reporting on accounts included in bankruptcy was false, the Defendant has intentionally and knowingly not corrected their policy of keeping false and damaging information on at least one of the Plaintiff's credit reports.  This notice has been provided directly to the Defendant from consumers, from the CRAs, and from lawsuits.

41.     Suits filed around the country and in this district against NCO have made it abundantly apparent to NCO that its system is either intentionally set up to falsely report or NCO has closed its eyes so as to be at least reckless in refusing to correct its false reporting on discharged accounts.

### FACTS – SUMMARY OF WRONGFUL CONDUCT

42.     It is a practice of the Defendant to maliciously, willfully, recklessly, wantonly, and/or negligently violate, ignore, and refuse to follow the requirements of the federal and state law related to reporting of Plaintiff's account to the CRAs.

43.     All actions taken by employees, agents, servants, or representatives of any type for Defendant was taken in the line and scope of such individuals' (or entities') employment, agency, or representation.

10

44.    All actions taken by the Defendant were done with malice, were done wantonly, recklessly, intentionally or willfully, and were done with either the desire to harm Plaintiff and/or with the knowledge that its actions would very likely harm Plaintiff and/or that its actions were taken in violation of the law.

45.    Defendant has engaged in a pattern and practice of wrongful and unlawful behavior with respect to accounts and consumer reports and therefore Defendant is subject to punitive damages, statutory damages, and all other appropriate measures to punish and deter similar future conduct by Defendant and similar companies.

**FIRST CLAIM FOR RELIEF**
**Violations of the Fair Debt Collection Practices Act**

46.    All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

47.    Defendant NCO is a debt collector under the FDCPA and violated the FDCPA in numerous ways regarding these consumer debts, including, but not limited to, the following:

    a.    Falsely reporting a balance owed on Edwards credit report;

    b.    Refusing to mark the account as disputed;

    c.    Falsely attempting to collect a debt (through the reporting of a balance and the refusal to correct the false reporting) when there is no legal right to collect the discharged debts; and

    d.    Refusing to properly update the accounts.

48.    Plaintiff has been damaged as a direct result of these violations of the FDCPA as set forth in this Complaint.

11

## SECOND CLAIM FOR RELIEF
### Defamation

49. All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

50. Defendant published false information about Plaintiff by reporting to one or more of the CRAs the Defendant's accounts with a false balance.

51. Each time the credit reports of Plaintiff have been accessed, a new publication occurred, which was the result intended by the Defendant.

52. Plaintiff alleges that the publications and defamations were done maliciously, without privilege, and with a willful intent to injure Plaintiff.

53. Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

54. Such statements exposed Plaintiff to contempt, ridicule and/or financial injury at the hands of those to whom the report was published. Most, if not all of those who saw the report were in a position to grant or deny credit, or to enter into some business transaction with Plaintiff such as an insurance contract. The people to whom the report was published were those to whom Plaintiff's credit reputation was most important. The audience for the defamatory statements was particularly interested in the information stated by the Defendant and was particularly situated to harm Plaintiff, as a result of the Defendant's actions, by denying Plaintiff credit or insurance or other business dealings of varying types.

## THIRD CLAIM FOR RELIEF
### Negligent, Reckless, and Wanton Conduct

55.    All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

56.    Defendant assumed a duty, through the subscriber agreement and other actions, to accurately report the balances of Defendant's accounts after individuals, like the Plaintiff, received a discharge.

57.    Defendant has agreed to follow and understand they must follow the requirements of the FCRA including:

- 15 U.S.C. § 1681(a)(1)(a) which states:

"A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."

- 15 U.S.C. § 1681(a)(1)(B) which states:

"A person shall not furnish information relating to a consumer to any consumer reporting agency if –
(iii)    the person has been notified by the consumer[3], at the address specified by the person for such notices, that specific information is inaccurate; and
(iv)    the information is, in fact, inaccurate."

- 15 U.S.C. § 1681(a)(2) which states:

" A person who –
(C)    regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and
(D)    has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency

---

[3] The notice here comes from the federal bankruptcy court relating directly to the consumer.

complete and accurate, and shall not thereafter furnish to the agency any
of the information that remains not complete or accurate."

[Emphasis added].

58.   Defendant has a duty under Alabama law to act reasonably under the circumstances.

59.   Defendant has violated this duty under Alabama law by failing to act reasonably under
the circumstances which include, but are not limited[4] to, the following:

- Defendant previously reported a balance owed by Plaintiff;

- Defendant routinely updates credit reports;

- Defendant received notice of the Plaintiff's filing of a bankruptcy petition;

- Defendant failed to object to its debts being discharged;

- Defendant received notice the debts were discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current
balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the
account was discharged or included in a Chapter 7 bankruptcy;

- Defendant knows that leaving a balance on a discharged account will harm the
Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows that failing to note the account is discharged or included in a
Chapter 7 bankruptcy will harm the Plaintiff, Plaintiff's credit worthiness, and/or
Plaintiff's credit score;

---

[4] Until discovery is completed, Plaintiffs cannot know all the circumstances for Defendant.

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge or included in Chapter 7 bankruptcy;

- Defendant knows and has agreed it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to update the accounts falsely; and

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

60.    Defendant violated all of the duties the Defendant had and such violations were made recklessly, wantonly, and negligently as Defendant refused to comply with all of the duties Defendant had.

61.    It was foreseeable, and the Defendant did in fact foresee it, that refusing to properly update would cause the exact type of harm suffered by the Plaintiff.

62.    Defendant acted with negligence, wantonness, and/or recklessness conduct in their dealings with and about Plaintiff as set forth in this Complaint. This includes the initial reporting of Defendant's accounts; the refusal to properly update the accounts; and all other aspects as set forth in this Complaint.

63.    Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

**FOURTH CLAIM FOR RELIEF**
**Malicious, Intentional[5] and Willful Conduct**

64.     All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully

         set forth herein.

65.     Defendant assumed a duty, through the subscriber agreement and other actions, to

         accurately report the balances of Defendant's accounts after individuals, like the Plaintiff,

         received a discharge.

66.     Defendant has agreed to follow and understand they must follow the requirements of the

         FCRA including:

   •     15 U.S.C. § 1681(a)(1)(a) which states:

   "A person shall <u>not furnish</u> any information relating to a consumer to any
   consumer reporting agency if the person <u>knows or has reasonable cause to believe
   that the information is inaccurate.</u>"

   •     15 U.S.C. § 1681(a)(1)(B) which states:

   "A person shall <u>not furnish information</u> relating to a consumer to any consumer
   reporting agency if –
   (v)     the person has been notified by the consumer[6], at the address specified by
           the person for such notices, that specific information is inaccurate; and
   (vi)    the <u>information is, in fact, inaccurate.</u>"

   •     15 U.S.C. § 1681(a)(2) which states:

   " A person who –

_____

[5] Even though this is in a different "Claim For Relief", a recent U.S. Supreme Court opinion
dealing with the FCRA has held that there is no distinction between wanton (reckless) conduct
and intentional (willful) conduct. *See Safeco Ins. Co. v. Burr*, 127 S.Ct. 2201, 2207-10
(2007)(citing *Prosser's Law of Torts* "Although efforts have been made to distinguish the terms
'willful,' 'wanton,' and 'reckless,' such distinctions have consistently been ignored, and the three
terms have been treated as meaning the same thing, or at least as coming out at the same legal
exit").

[6] The notice here comes from the federal bankruptcy court relating directly to the consumer.

16

(E)     regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

(F)     has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains not complete or accurate."

[Emphasis added].

67.    Defendant has a duty under Alabama law to act reasonably under the circumstances.

68.    Defendant has violated this duty under Alabama law by failing to act reasonably under the circumstances which include, but are not limited[7] to, the following:

- Defendant previously reported a balance owed by Plaintiff;

- Defendant routinely updates credit reports;

- Defendant received notice of the Plaintiff's filing of a bankruptcy petition;

- Defendant failed to object to its debts being discharged;

- Defendant received notice the debts were discharged;

- Defendant understands the legal effect of a discharge;

- Defendant knows that a user of a credit report of Plaintiff will see a "current balance" of more than zero.

- Defendant knows the account reported to the CRAs does not show that the accounts were discharged or included in a Chapter 7 bankruptcy;

- Defendant knows that leaving a balance on a discharged account will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

---

[7] Until discovery is completed, Plaintiff cannot know all the circumstances for Defendant.

- Defendant knows that failing to note the accounts are discharged or included in a Chapter 7 bankruptcy will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

- Defendant knows it is an extraordinarily easy matter to update the Plaintiff's credit report to show a zero balance and discharge or included in Chapter 7 bankruptcy;

- Defendant knows and has agreed it must follow the FCRA which requires inaccurate information to be updated and corrected;

- Defendant has chosen to update the accounts falsely and has changed the account number; and

- Defendant knows its actions will harm the Plaintiff, Plaintiff's credit worthiness, and/or Plaintiff's credit score;

69.   Defendant violated all of the duties the Defendant had and such violations were made intentionally, willfully, and maliciously as Defendant refused to comply with all of the duties Defendant had.

70.   Defendant has acted in utter disregard for the rights of the Plaintiff and have decided to take (or fail to take) action which Defendant knows or is substantially certain will result in harm to Plaintiff. The Defendant has acted wrongfully without just cause or excuse as Defendant has and had an intent to harm the Plaintiff and/or acted with an evil intent.

71.   It was foreseeable, and Defendant did in fact foresee it, that refusing to properly update would cause the exact type of harm suffered by the Plaintiff.

72.   Defendant acted with malice and/or intentional (willful) conduct in its dealings with and about Plaintiff as set forth in this Complaint. This includes the initial reporting of

18

Defendant's accounts; the intentional refusal to properly update the accounts; and all other aspects as set forth in this Complaint.

73.   Plaintiff has been damaged as a proximate result of Defendant's wrongful conduct as set forth in this Complaint.

## FIFTH CLAIM FOR RELIEF
### Invasion of Privacy

74.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

75.   Defendant recklessly, intentionally, and/or willfully invaded the privacy of Plaintiff as set forth in Alabama law, including publishing false information about Plaintiff's personal financial obligations and refusing to properly update the credit reports as described in this Complaint.

76.   Plaintiff has been damaged as a proximate result of each Defendant's wrongful conduct as set forth in this Complaint.

## SIXTH CLAIM FOR RELIEF
### Misrepresentation and/or Suppression

77.   All paragraphs of this Complaint are expressly adopted and incorporated herein as if fully set forth herein.

78.   Defendant intentionally, maliciously, recklessly and/or negligently has committed misrepresentations of material facts in that Defendant has falsely represented that Plaintiff owes money to that Defendant and has suppressed the truth that Plaintiff no longer has any personal liability to any of the Defendant and that the accounts in question have been discharged.

19

79.   Defendant has intended that the CRAs and all who review the credit reports of Plaintiff will rely upon the misrepresentations and suppressions of material facts related to the balance owed and the lack of indication that the accounts were discharged or included in bankruptcy.

80.   Defendant has intended that the justifiable and reasonable reliance by others would adversely affect the Plaintiff and that has been the result.

81.   Such negligence, malice, wantonness, recklessness, willfulness, and/or intentional conduct related to the misrepresentations and suppressions of material facts has proximately caused the damages set forth in this complaint.

### RELIEF SOUGHT

82.   An award of compensatory and punitive damages for Plaintiff, and costs of the action including expenses, and attorney fees against Defendant for Defendant's wrongful conduct.

83.   Plaintiff also request all further relief to which Plaintiff is entitled, whether of a legal or equitable nature, against Defendant.

Respectfully Submitted,

/s/ John G. Watts
**John G. Watts**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
700 29th Street South, Suite 201
Birmingham, AL  35233
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattslawgroup.com

20

/s/ M. Stan Herring
**M. Stan Herring ASB-1074-N72M**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
700 29th Street South, Suite 201
Birmingham, AL 35233
(205) 879-2447
**(888)** 522-7167 *facsimile*
msh@mstanherringlaw.com

21

**Serve defendant via certified mail at the following address:**

NCO Financial Systems, Inc.
c/o The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109

# EXHIBIT

# "A"



► Close Window

NOVEMBER 12, 2007

COVER STORY
By Robert Berner and Brian Grow

# Prisoners of Debt

**The fresh start promised by bankruptcy is under attack as big lenders keep squeezing money out of consumers whose debts were canceled by the courts**



In a financial version of *Night of the Living Dead*, debts forgiven by bankruptcy courts are springing back to life to haunt



**COVER
STORY
PODCAST**

consumers. Fueling these miniature horror stories is an unlikely market in which seemingly extinguished debts are avidly bought and sold.

The case of Van Rathavongsa illustrates how canceled debts regain vitality. The Raleigh (N.C.) factory worker pulled himself out from beneath a mountain of bills by means of a bankruptcy proceeding that wrapped up in 2002. One of the debts the judge canceled, or "discharged," was $9,523 Rathavongsa owed to Capital One Financial (COF), the big credit-card company. But Capital One continued to report the factory worker's discharged debt to credit bureaus as a live balance, according to documents filed in U.S. Bankruptcy Court in Raleigh.

This kind of failure by creditors to update credit reports happens with some frequency, consumer lawyers and court-employed bankruptcy trustees say. And it can have consequences: In September, 2003, when Rathavongsa tried to close on a $274,650 mortgage for a new house, his would-be lender, Wachovia (WB
), said he would either have to pay Capital One or show proof from the credit-card company that the debt had been discharged. Despite several calls and a letter from his attorney, he says, Capital One never revised the credit report. To obtain the home loan, Rathavongsa eventually did what many consumers in this situation do. He gave in and paid Capital One $9,523 he no longer legally owed.

#### `HAPPENS ALL THE TIME, YOUR HONOR'

Because of episodes like this, discharged debts have attracted the attention of little-known firms expert at buying and selling a range of delinquent consumer obligations. Back-due bills with a face value of billions of dollars change hands at a steep discount every year. Five of the companies in this business are publicly traded on Nasdaq. Others have large private-money backers. B-Line, in Seattle, was acquired last year by the Dallas-based hedge fund firm Lone Star Funds. The investment bank Bear Stearns (BSC) owns two bankruptcy-debt buyers: Max Recovery and eCast Settlement.

The very existence of this marketplace confounds even some veterans in the bankruptcy field. During a preliminary hearing in New York in March, U.S. Bankruptcy Judge Robert Drain asked a lawyer for JPMorgan Chase (JPM) how the bank had managed to sell consumer credit-card debts that had been discharged. "I don't know who would buy a discharged account," the perplexed judge said.

"Happens all the time, your honor," the Chase lawyer, Thomas E. Stagg, responded.

Drain's confusion is understandable. Traditionally, discharged debt was seen as not worth the paper it's written on. Once a judge excuses some of a debtor's obligations—part of the bankruptcy system's goal of granting a financial fresh start—that person has no legal duty to pay them. In fact, bankruptcy law prohibits efforts to collect discharged debt.

In the 1990s, businesses adept at tracking and trading consumer debt expanded their reach to dabble in accounts enmeshed in bankruptcy. That dabbling has grown into a robust market. Some of the trade in so-called bankruptcy paper involves debts that remain collectible. What's troubling is that the market now also includes billions in discharged debts, which ought to have no dollar value. Owners

of canceled liabilities can revive their value in two main ways: by directly pressuring consumers to cough up cash or by gaming the credit system, as allegedly happened in the Rathavongsa case.

### `CAVALIER ATTITUDE`

The Raleigh man filed a motion in bankruptcy court in November, 2003, asserting that Capital One had improperly failed to update his credit report. U.S. Bankruptcy Judge A. Thomas Small agreed. Capital One, Small wrote in December, 2003, "most likely received notice" of Rathavongsa's bankruptcy filing, as indicated by the company's having ceased trying to collect the debt. Because Capital One never responded to Rathavongsa's motion, the judge wrote, "the court can assume that Capital One filed the erroneous credit report for the purpose of pressuring Rathavongsa to pay a discharged debt." In February, 2004, the judge ordered the company to repay the $9,523, as well as $14,000 in fines and attorney's fees for its "cavalier attitude toward the debtor's motion."

A Capital One spokeswoman, Tatiana Stead, says: "Our records show we did not receive proper notice regarding the bankruptcy notice or subsequent discharge of Mr. Rathavongsa's account." The company has paid what the judge ordered "to put an end to the matter and avoid the additional expenditure of resources that would have been required to appeal the judge's ruling," she says.

Consumer lawyers and even some longtime players in the bankruptcy-paper market say they're worried that the trading of canceled debt encourages unsavory efforts to collect on discharged debt. "What you are highlighting is a significant abuse in the industry," acknowledges William Weinstein, a former chief executive of B-Line and a pioneer in the debt-buying business. Speaking generally and not about his former company, he confirms that some lenders and debt buyers simply hound consumers to pay debts that have been canceled, while others refrain from informing consumer credit bureaus when debts are eliminated. "The failure to accurately update credit reporting has allowed unscrupulous activity to prosper," says Weinstein. He left B-Line last year after it was purchased by Lone Star for an undisclosed sum, a departure marked by now-settled litigation between Weinstein and his former company. B-Line's current president, Rui Pinto-Cardoso, says the firm doesn't engage in the practices Weinstein describes.

### `AN ALLEGED TRAP` FOR DEBTORS

The pair of plaintiffs whose case in New York came before Judge Drain in March alleged they had been hurt by credit reports that hadn't been brought up to date. Yvette R. Torres and Ariadna Mateo had owed Chase a total of $7,674 on three credit-card accounts. Those debts were discharged years earlier during proceedings under Chapter 7 of the U.S. Bankruptcy Code. Torres and Mateo sued Chase because the three accounts continued to appear on their credit reports, as if they were live. According to a hearing transcript, the judge said he was suspicious about why Chase hadn't updated the reports when it received routine court notices of the discharges. Chase, the judge speculated, might have been trying to use the incorrect credit reports as a way to pressure the debtors to pay off the discharged debt. Further, the judge said, "the only reason Chase could sell it is because someone believed they could collect on it."

On May 3, Judge Drain denied Chase's motion to dismiss the central claim by Torres and Mateo. "The essence of the plaintiffs' allegations is that Chase has continued to lay a trap for them until the eventual day that they need an accurate credit report," the judge said in a written ruling. "Such behavior, if proven at trial, would be sufficiently vexatious and oppressive to support at least sanctions in the amount of plaintiffs' costs and expenses incurred in releasing the trap." A trial date hasn't been set.

Denying any infraction, Chase has said in court papers that it didn't try to collect debts improperly and that it had no legal duty to update the credit reports. In a prepared statement, Chase spokeswoman Tanya Madison adds that the lender generally "does not attempt to collect a debt once we learn that the account is included in a bankruptcy filing." Chase notifies credit bureaus that an account is "subject to a bankruptcy" within 60 days of the lender learning of a bankruptcy filing, Madison says. She declines to comment on Chase's sale of discharged debts or on any suit.

Other judges warn that the secondary market in bankruptcy paper is encouraging improper collection tactics, which increase the potential value of that debt. William R. Sawyer, a U.S. bankruptcy judge in Montgomery, Ala., says that in the past two years he has seen a surge in cases alleging that lenders and debt buyers have purposefully neglected to report the discharge of debt to credit bureaus. The ploy, he says, is an "indirect means" of pushing consumers to pay debts they no longer really owe. "Creditors and collectors are skating as close as they can to the law and really trying to diminish its value."

### AN INDUSTRY TRANSFORMED

There aren't any reliable statistics to document this development, however, and the legal parameters remain murky. Since 1986 the staff of the Federal Trade Commission has issued a series of formal "opinion letters" saying that the credit bureaus should report when debts have been discharged. Clarke W. Brinkerhoff, an FTC staff attorney who wrote two of the letters, says that in the view of the commission, creditors must inform credit bureaus that the discharged accounts have a zero balance. But that obligation doesn't appear in any statute.

Ambiguities abound. Bankruptcy judges are divided on whether a lender's failure to update a credit report can be considered an improper attempt to collect. The Fair Credit Reporting Act requires credit bureaus to ensure "maximum possible accuracy" of their reports, but the bureaus are allowed to rely on lenders to provide debt information. "These laws were not written for the way this industry has been transformed," says Ronald J. Mann, a law professor at Columbia University. Nevertheless, Representative Jerrold Nadler (D-N.Y.), a member of the House Judiciary Committee, says the Justice Dept. should investigate whether creditors and debt buyers are trying to collect discharged debts. "Documented abuses have largely gone unpunished," he says.

Belinda Hedge knows more about bankruptcy law than the average non-lawyer from working as a debt collector for a student loan firm. She filed for protection from creditors in November, 2005, in part, she says, because a friend-turned-identity-thief opened credit-card accounts in Hedge's name and ran up $12,079 in bills. In March, 2006, most of her debts, including two credit-card accounts with Capital

One totaling $2,414, were discharged by the U.S. bankruptcy court in Knoxville, Tenn. "Once you file, they're supposed to cease all contact," says Hedge.

But last year, Capital One and two debt collectors it hired tried more than 140 times by phone and mail to collect on one of the discharged accounts, according to letters and a phone log the 41-year-old Hedge kept. She sent the company and its collectors court records from her bankruptcy, but the calls continued. Collectors have called her mother and brother 10 times and threatened to contact her employer and garnish her wages, Hedge says. Stead, the Capital One spokeswoman, attributes the collection attempts to the lender's failure to update Hedge's credit report to reflect the discharge, and says that it is correcting the error. Capital One doesn't "conduct direct collection efforts [on] accounts after they have been discharged," she adds.

### SPREADING MISBEHAVIOR

Hedge's experience isn't unusual, says Brian Budsberg, a Tacoma (Wash.) U.S. bankruptcy trustee, a court official who oversees bankruptcy cases. Budsberg says his impression is that the number of debtors alleging collection abuse "is greater than it has ever been." Trustees elsewhere agree. Lately, Budsberg says, he has observed "an emboldened attitude by the collection arms of credit-card companies and debt buyers."

The market in discharged debt has its roots in the early 1990s, when lenders began to seek at least minimal returns from overdue consumer accounts. The stale debts included those of customers who had filed under Chapter 7, saying they couldn't pay their bills, and those who filed under Chapter 13, a provision allowing individuals with some resources to set up schedules to pay creditors. Creditors are notified by the court when a consumer files bankruptcy, and again when a discharge is granted.

Some lawyers and bankers saw a business opportunity in the bulk acquisition of bankrupt paper. "It was a new niche. Banks didn't understand what it was worth," says Charles Rusbasan, a former executive with Chemical Bank before it acquired Chase and adopted the Chase name. Rusbasan approached Bear Stearns in 1992 to finance a debt-buying operation, and that led to the birth of Max Recovery. Today he is CEO of Max Recovery, which is in London, and its sister, eCast Settlement in New York. He is also a senior managing director at Bear Stearns.

Rusbasan says that the keys to success in this esoteric field are buying debt very inexpensively—it can sell for a fraction of a cent on the dollar—and employing proprietary software to track debts as they move through the bankruptcy process. He plays down his companies' trading in debt discharged under Chapter 7, saying most of his business has focused on Chapter 13 debt, which is supposed to be repaid. Bear Stearns doesn't break out the financial results of its debt-buying units, but filings by publicly traded debt buyers show they are highly profitable. Norfolk (Va.)-based Portfolio Recovery Associates (PRAA) earned $44 million in 2006 on $188 million in revenue, a margin of 23%. Portfolio Recovery said in its 2006 annual report that it had paid $55 million to buy debts with a face value of $6.3 billion that had gone into bankruptcies since 2004. (It didn't distinguish between Chapter 7 and Chapter 13 cases.)

Rusbasan says that sales of Chapter 7 debt are growing. One large bank, which he won't name, is planning a bulk sale of Chapter 7 debt this fall with a face value of $3 billion, he says. He expects similar mass sales later this year and next.

B-Line's former CEO, Weinstein, who started the company in 1997, takes credit for helping build the market for Chapter 7 debt. Even debt initially designated as discharged can bring legitimate returns, he says. In some cases, bankruptcy courts discover that Chapter 7 debtors have additional assets, which are then divided among creditors. Other Chapter 7 cases are moved to Chapter 13 or dismissed altogether, making debts potentially collectible. In a tiny fraction of cases, people repay discharged debts out of a sense of moral duty.

Increased competition recently in the bankruptcy-paper market has driven up the price of discharged debt—from 1/20th of a cent on the dollar to 3/20ths, or higher—and that has helped spur more aggressive collection tactics, Weinstein says. He says he hasn't participated in any improper conduct.

### SECOND THOUGHTS

Raymond P. Bell Jr. sees worrisome efforts to collect on discharged debts from his perch as vice-president of the bankruptcy and probate division of Creditors Interchange in Abington, Pa. His unit collects on a variety of bankruptcy paper for banks and debt buyers, clients Bell won't name. A veteran of 43 years in the field, he agrees that intensifying competition has led some "cowboys" to try to collect on discharged debts. In early 2005, an analysis of several hundred accounts from one client showed that 85% had been discharged in bankruptcy. Rather than try to squeeze money from those accounts, Bell says he dropped the client.

One company that plays a middle-man role in the bankruptcy-paper market has had second thoughts. Online marketplace CreditMax, based in West Palm Beach, Fla., says it has brokered more than $1.2 billion in bad loans. That includes 25 to 30 bulk sales of Chapter 7 credit-card debt, each with $1 million to $10 million of face value, to two major buyers. But in response to questions from BusinessWeek, CreditMax said on Aug. 21 that it would stop selling Chapter 7 debt. In an e-mail, company founder Stephen Kass called the move "socially responsible," without further explanation.

There's no evidence of a rush to imitate CreditMax. A rival, DebtConnection.com, posted on June 20 an offer to sell a batch of Chapter 7 bankruptcy accounts with a face value of $200 million. The sale was on behalf of Collect America, one of the nation's largest debt buyers and collectors. The posting said the bankruptcy cases had an average filing date of April, 2006. Most Chapter 7 cases are resolved within about six months, which means many of the accounts would have been discharged by the time they were sold into the secondary market. John Curry, a senior vice-president at Collect America, declines to discuss the June 20 sale. But discharged debts, he says, are finding eager purchasers. "There are companies—that is all they buy," he says. Manny Newburger, a name partner with Austin (Tex.) law firm

Prisoners of Debt                                              http://www.businessweek.com/print/magazine/content/07_46/b4058001...

Barron, Newburger, Sinsley & Weir, which represents Collect America, says that his client isn't aware of abuse by buyers of such debts.

But at the same law firm, another attorney for lenders and debt buyers frets that the heating up of the bankruptcy-paper market portends misuse of tools like the credit report. "There is a sense that people are using it as a weapon," says Barbara M. Barron, the firm's managing member. After Chapter 7 cases, "debtors expect their credit is going to become pristine," she notes. "But now you have people who buy the debts, even bankruptcy debts, and all of a sudden, new people are supplying information to the credit bureaus." She adds: "The way the system is working now, it doesn't give [debtors] that fresh start."

## SOLD AND THEN RESOLD
The case of John Pfister, in which Barron Newburger has no role, provides one illustration. Pfister, 63, a retired AT&T (T) technical supervisor in Denton, Tex., received a Chapter 7 discharge in 2001. Then, last January, while applying for a mortgage, he learned that two discharged credit-card debts, a Discover Card balance of $6,306 and a former Chase account for $2,683, were showing up on his credit reports. Lenders turned him away because of what appeared to be unpaid obligations, he says.

The Chase loan has been sold twice and is now owned by a debt buyer called Pinnacle Credit Services, according to Pfister's reports from credit bureaus TransUnion and Experian. Pinnacle reported to those credit bureaus as recently as May—six years after the bankruptcy discharge—that the debt is still subject to collection. In addition, Pinnacle has given the former Chase debt a new account number. Pfister's lawyer, James J. Manchee, says that creating a new account number is a strategy some debt buyers use to make it more difficult to tie accounts back to discharged debts, and therefore make the debts appear collectible. Pinnacle declined to comment. In June, Quicken Loans became the 12th mortgage lender to reject Pfister.

Exacerbating Pfister's frustration, collectors for Discover were still leaning on him as recently as late August, despite his having faxed them a copy of his bankruptcy papers. On Sept. 20, he sued Discover in U.S. Bankruptcy Court in Dallas. Contacted by *BusinessWeek*, a Discover spokeswoman blamed the collection attempts on administrative error and said Pfister's credit report has now been corrected. She declined to discuss the lawsuit.

Berner is a correspondent for *BusinessWeek* in Chicago and Grow is a correspondent in *BusinessWeek*'s Atlanta bureau

Advertising | Special Sections | MarketPlace | Knowledge Centers

Terms of Use | Privacy Notice | Ethics Code | Contact Us

The McGraw Hill Companies

Copyright 2000- 2008 by The McGraw-Hill Companies Inc.
All rights reserved.

Xerox Color. It makes business sense.



## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| ASHLEY EDWARDS, an<br>individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action Number: |
| | ) | |
| NCO FINANCIAL SYSTEMS, | ) | |
| INC., a Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

### SUMMONS

This service by Certified Mail of this Summons and Complaint is initiated upon written request of the Plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO:        NCO Financial Systems, Inc.
                  c/o The Corporation Company
                  2000 Interstate Park Drive
                  Suite 204
                  Montgomery, Alabama 36109

The Complaint which is attached to this Summons is important and you must take immediate action to protect your rights. You or your attorney are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to the Plaintiff's attorney, John G. Watts, Watts Law Group, P.C.,700 29th Street South, Suite 201, Birmingham, Alabama 35233. **THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.** You must also file the original of your Answer with the Clerk of this Court.

_____        _____
Date                           Clerk



## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ASHLEY EDWARDS, an )
individual, )
                  )
    Plaintiff, )
                  )
v. )      Civil Action Number:
                  )
NCO FINANCIAL SYSTEMS, )
INC., a Corporation, )
                  )
    Defendant. )

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT

    **COMES NOW** the Plaintiff, Ashley Edwards ("Plaintiff"), and submits these requests

for admissions to be answered by Defendant NCO Financial Systems, Inc. ("Defendant") within

the time limits set forth by the Alabama Rules of Civil Procedure:

1.    Admit that you updated your reporting of account numbers 2027xxx, 2307xxx, and

    2774xxx after January 5, 2007.

2.    Admit that before the discharge order was issued, you received notice from the

    bankruptcy court in the Northern District of Alabama, that Plaintiff had filed

    bankruptcy.

3.    Admit that you received a notice from the bankruptcy court informing you that there

    was a meeting of the creditors scheduled and you were invited to participate.

4.    Admit that you were told by the bankruptcy court you had a deadline to file any

    objection you had to your debts being discharged.

5.    Admit that you did not appear at the meeting of the creditors.

6.    Admit that you did not file any objection within the time limits of the bankruptcy

    court's order.

7.     Admit that from the time of the first reporting of these accounts to Equifax to the present day, you signed a contract or agreement with Equifax in which you agreed to undertake the obligations set forth in the contract or agreement.

8.     Admit that from the time of the first reporting of these accounts to Experian to the present day, you signed a contract or agreement with Experian in which you agreed to undertake the obligations set forth in the contract or agreement.

9.     Admit that from the time of the first reporting of this account to Trans Union to the present day, you signed a contract or agreement with Trans Union in which you agreed to undertake the obligations set forth in the contract or agreement.

10.     Admit that you have agreed in one or more of your contracts or agreements with Equifax, Experian, and/or Trans Union, that for past due accounts that have become discharged, you will update the accounts to show it as discharged or included in bankruptcy.

11.     Admit that you have updated (since the discharge order) your accounts with at least one credit reporting agency to show current balances due of greater than zero with no notation that the accounts were included in bankruptcy.

12.     You intended that other persons or entities would see the information that you had reported on this account if such other persons or entities reviewed Plaintiff's credit reports from the CRAs to whom you had furnished information about Plaintiff.

13.     Admit that you knew that reporting a balance on Plaintiff's credit reports would adversely affect Plaintiff's credit worthiness.

2

14.    Admit that you have not requested that all consumer reporting agencies (which previously reported your alleged debt with Plaintiff) to update it to show a zero balance.

15.    The information related to your accounts on Plaintiff's Experian credit report is inaccurate.

16.    The information related to your account on Plaintiff's Experian credit report is false.

17.    The information related to your account on Plaintiff's Trans Union credit report is inaccurate.

18.    The information related to your account on Plaintiff's Trans Union credit report is false.

19.    When the discharge order was entered, you understood that Plaintiff no longer owed you any money on these accounts.

20.    Since the discharge order, you have furnished information about consumers to each CRA.

21.    You have a policy to no longer furnish information to CRAs after you receive notice of a bankruptcy filing on a consumer that you claim owes you money.

22.    You have a policy to no longer furnish information to CRAs about a consumer after you receive notice of a discharge order on the consumer that you previously had reported as owing you money.

23.    You agree that the FCRA requires you to furnish accurate information to the CRAs.

24.    You agree that the FCRA prohibits you from furnishing false information to the CRAs.

3

25.    You agree that if you find out that previously reported information is no longer accurate, you have an obligation under the FCRA to correct the furnished information.

26.    You agree that if you find out that previously reported information is no longer accurate, you have an obligation under the agreement or contract with one or more of the CRAs to correct the furnished information.

27.    You agree that if you find out that previously reported information is no longer accurate, you have an obligation under Alabama state law to correct the furnished information.

28.    The manner in which you treated Plaintiff after Plaintiff's discharge (not updating Plaintiff's credit reports to show a zero balance) was entirely consistent with your policy and procedure for what to do when you receive notice of a discharge order covering accounts for which you previously reported a balance.

29.    You report to one of the CRAs at least on a monthly basis concerning your accounts that you have chosen to report to the CRAs.

30.    If Plaintiff (or someone on Plaintiff behalf) had sent money to you for these accounts, you would have accepted it despite the bankruptcy discharge order.

31.    You have received, in 2002-2008, more than 50 notices of disputes from consumers directly or from CRAs with the disputes or notifications informing you that the consumer claimed an account showing a balance was actually discharged in bankruptcy.

32.    You have received, in 2005 through the present date, more than 50 notices of disputes from consumers directly or from CRAs with the disputes or notifications informing

4

you that the consumer claimed an account showing a balance was actually discharged in bankruptcy.

33.    In response to the disputes and notifications from CRAs and/or from consumers that consumers were claiming accounts discharged in bankruptcies were still showing a balance, you made no change to your policies and procedures.

34.    In response to this suit, you have made no changes to Plaintiff's credit reports.

/s/ John G. Watts
**John G. Watts**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattslawgroup.com

/s/ M. Stan Herring
**M. Stan Herring**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 714-4443
(888) 522-7167 *facsimile*
msh@mstanherringlaw.com

**PLEASE SERVE WITH THE SUMMONS AND COMPLAINT**

ELECTRONICALLY FILED
4/16/2008 7:33 PM
CV-2008-901177.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| ASHLEY EDWARDS, an individual, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )      **Civil Action Number:** ) |
| NCO FINANCIAL SYSTEMS, INC., a Corporation, | ) ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

PLEASE TAKE NOTICE that you are hereby notified and required to respond to the following Interrogatories propounded by Plaintiff herein, through his attorneys of record, M. Stan Herring and John G. Watts in accordance with the provisions of Rule 33, et seq., of the Alabama Rules of Civil Procedure.

You are further placed on notice that these Interrogatories are deemed continuing, requiring supplemental responses thereto in the event requested information becomes available which would require amendment or supplementation of your responses in order that they would be proper and truthful.

### INSTRUCTIONS

In answering these Interrogatories, please furnish all information which is available to you, including, without limitation, all information in the possession of your attorneys, accountants, affiliates, auditors, agents, employees, officers, directors, shareholders, contractors, or other personnel, and not merely such information as is in your possession.

If you cannot respond to any of the following Interrogatories in full, after exercising due diligence to secure information to do so, please so state, and respond to the extent possible, specifying all reasons why you are unable or unwilling to respond to the remainder, stating whatever information you have concerning the unproduced information, and what efforts you made to secure information sufficient to allow you to respond fully to the particular Interrogatory.

Although one or more of the following Interrogatories may not appear to be applicable to or directed to you, please respond to each and every one of them to the extent that you are able to provide any response thereto whether such response consists of information within your own knowledge or what you have obtained from others. However, for every response in which you include information received from others, please provide the name, any known address, and any known phone number of the person from whom you so received such information. And, in every such instance please state that you cannot verify such of your own personal knowledge, identifying particularly the information for which you cannot vouch. Further, these Interrogatories contain words or phrases which require you to refer to the "Definitions" section of this document provided herein below.

Unless otherwise stated, each Interrogatory pertains to the time period beginning January, 2004, through the present date. Thus, your responses should be fully answered as they pertain to information within that time frame. Further, each Interrogatory should identify the appropriate time frame, if your response requires same.

## DEFINITIONS

1. "You" includes NCO Financial Systems, Inc., d/b/a Medclear, the company, entity, institution, agency, subsidiary(ies), parent corporation(s) and/or any of its branches, departments,

employees, agents, contractual affiliates, or otherwise connected by legal relationship, in the broadest sense. "You" includes any of your sister companies or related entities, whether or not separately incorporated.

2.    "Document(s)" shall mean and include any printed, typewritten, handwritten or otherwise recorded matter of whatever character, including specifically, but not exclusively, and without limiting the generality of the foregoing, letters, diaries, desk and other calendars, memoranda, telegrams, posters, cables, reports, charts, statistics, envelopes, studies, newspapers, news reports, business records, book of account(s) or other books, ledgers, balance sheets, journals, personal records, personal notes, any piece of paper, parchment, or other materials similarly used with anything written, typed, printed, stamped, engraved, embossed, or impressed upon it, accountants statements, accounting records of any kind, bank statements, minutes of meetings or other minutes, labels, graphics, notes of meetings or conversations or other notes, catalogues, written agreements, checks, announcements, statements, receipts, returns invoices, bills, warranties, advertisements, guarantees, summaries, pamphlets, prospectuses, bulletins, magazines, publications, photographs, work-sheets, computer printouts, telex transmissions or receipts, teletypes, telefaxes, file folders or other folders, tape recordings, and any original or non-identical (whether different from the original by reason of any notation made on such copies or otherwise), carbon, photostatic or photograph copies of such materials. The term "documents" shall also mean and include every other recording of, or means of recording on any tangible form, any form of information, data, communication, or representation, including but not limited to, microfilm, microfiche, any records stored on any form of computer software, audio or video tapes or discs, digitally recorded disks or diskettes, or any other medium whatsoever.

For each "document" responsive to any request withheld from production by you on the ground of any privilege, please state:

(a)     The nature of the document (e.g., letter, memorandum, contract, etc.);

(b)     The author or sender of the document;

(c)     The recipient of the document;

(d)     The date the document was authored, sent, and/or received; and

(e)     The reason such document is allegedly privileged.

3. "Audit Trail" means a complete, detailed listing of each and every alteration, deletion, inquiry into, modification or other change to the credit report or profile as maintained in recorded form, in the broadest sense, by "you." The listing should include the identity, address, employer and title of the person(s) taking the action, the identity, address, employer and title of the person(s) authorizing the action, a detailed explanation of the action taken, the date of the action, the means used to effect such action, the location of origin of the action and the reason the action was taken. The term "audit trail" also includes the definition provided for the phrase in the Federbush, Federal Trade Commission and Formal Staff Opinion Letter, March 10, 1983.

4. "Data" means the physical symbols in the broadest sense that represent information, regardless of whether the information is oral, written or otherwise recorded.

5. "Data field" means any single or group of character(s), number(s), symbol(s) or other identifiable mark(s) maintained in a permanent or temporary recording which represent, in any way, an item or collection of information. "Data field" includes all types of data whether maintained in integer, real, character or boolean format.

6.     "Database" or "databank" means any grouping or collection of data field(s) maintained, in any format or order, in any permanent or temporary recorded form.

7.  "Hardware" means the physical components of a computer or any device capable of maintaining recorded data.

8.  "Software" means the entire set of computer programs, procedures, documentation, or other recorded instructions which guide a mechanical device or human in the operation of the computer or mechanical device.

9.  "Computer" means any and all programmable electronic devices or apparatuses, including hardware, software, and other databanks, that can store, retrieve, access, update, combine, rearrange, print, read, process or otherwise alter data whether such data are maintained in that device or at some other location.  The term "computer" includes any and all magnetic recordings or systems, systems operating on or maintaining data in digital, analog, or hybrid format, or other mechanical devices, or other devices capable of maintaining writings or recordings, of any kind, in condensed format, and includes any disk, tape, recording, or other informational source, regardless of its physical dimension or size.

10.  "Format" means the general makeup or general plan of organization or arrangement of data.

11.  "Identify" means that you should state:

(a)    any and all names, legal, trade or assumed;

(b)    all addresses used;

(c)    all telephone and fax numbers used; and, if applicable:

(d)    brand, make, manufacturer's name, address, phone number and the manufacturer's relationship to any and all Defendants in the above captioned action; and

(e)    employer's name, address, phone number and the employer's relationship to any and all Defendants in the above captioned action.

12.  "Person(s)" means any human being, sole proprietorship, limited partnership, partnership, association, group of human beings, other legal or de facto entity, or corporation, of whatever kind.

13.  "Credit worthiness" means any item of information which, in any way, represents or bears upon the credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of a person.

14.  "Credit issuer" means any person who extends, purchases or takes assignments of credit to any consumer(s), as the whole or part of their business, regardless of the nature of the arrangement between the consumer and the person issuing credit.

15.  "Explain" means to elucidate, make plain or understandable, to give the reason for or cause of, and to show the logical development or relationships thereof.

16.  "Describe" means to represent or give an account of in words.

17.  "Security Assessment" means any method of determining the effectiveness of security or continuity measures in dealing with security-related or continuity-related risks.

18.  "Security-related" means maintaining the integrity of and controlling access to data.

19.  "Continuity-related" means preventing, mitigating and recovering from disruption of computer operation.

20.  "Information Security Programs" are those programs, computer-based or otherwise, which support your overall goals while enabling only authorized users to use your computer [system] and enabling the computer processes to function as designed.

21.  "User" means any person or computer which interacts with a different computer.

22. "Access Programs" means those programs, physical or computer-based, which insure authorization, identification, verification, access control, accountability and security audit of your consumer credit database.

23. "Information Protection Architecture" means a statement of the overall design and operating objectives for the security, continuit and control of your consumer credit database.

24. "Consumer Credit Database" is intended to mean your entire Equifax consumer credit network, including but not limited to text file mode, file purge, file reorganization mode, all operator preamble, identification and password modes, and all other single or overlaying programs, applications and/or systems, and does include, but is not limited to, the main operating system.

25. "Personal Identifiers" means a person's name or social security number or other unique data which identifies or is associated with a particular "person."

26. "Credit scoring" refers to numerical assessments, provided by you or any other consumer reporting agency to a subscriber, designed to grade the specific consumer and calculate the risk of granting credit. This term includes all forms of scoring including, but not limited to, application scoring, behavior scoring and credit bureau scoring.

27. "Application scoring" refers to your programs designed to evaluate information on a consumer's application and the consumer's existing credit bureau report, as found on your database, using certain characteristics in predicting repayment.

28. "Behavior scoring" refers to your program designed to assess the credit risk of current customers of your subscriber. The assessment results from an analysis of the targeted consumer's purchase and payment history with your subscriber.

29.  "Credit Bureau scoring" refers to your programs to assess the credit risk of a targeted consumer based upon a comparison of that consumer's credit report data with the data from credit reports of other consumers on your consumer credit database using your predetermined characteristics and algorithm to predict future payment behavior of the targeted consumer.

30.  "Plaintiffs' Disclosure Documents, Bates Stamped" refers to a full set of Bates stamped, non-privileged documents voluntarily produced for inspection to all opposing counsels of record in this action by counsel for Plaintiffs.

31.  "Plaintiff" refers to Ashley Edwards.

32.  "Other Defendant" means any Defendant(s) in the above entitled and captioned.

33.  "Block" means a group of words, characters or digits that are held in one section of an input/output medium and handled as a unit; e.g., the data recorded on a punched card, or the data recorded between two interblock gaps on a magnetic tape.

34.  "Blocking" means combining two or more records into one block usually to increase the efficiency of computer input and output operations.

35.  "Block Size" is the number of records per block multiplied by the record size.

36.  "CAFE" means the system of programs that processes your customer tapes.

37.  "Byte" means a group of adjacent bits operated on as a single unit and usually shorter than a word.

38.  "Program" means the following: (1) a plan for solving a problem; (2) to devise a plan for solving a problem; (3) a computer routine (i.e., a set of instructions arranged in proper sequence to cause a computer to perform a particular process); (4) to write a computer routine.

39.  "Header record" means a machine readable record at the beginning of a file containing data identifying the file and data used in file control.

40. "Account" or "Accounts" means any Bank of America account or tradeline reported by you on Plaintiff's credit report at any time.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please state the full name, address, job title, occupation and name and address of the present employer of each person answering or assisting in answering these interrogatories on your behalf.

### INTERROGATORY NO. 2:

For each month or year since January 2003, state the total number of disputes received from consumers directly (not through the consumer reporting agencies) which suggested in any manner that accounts which were discharged were not being reported accurately. For each time period, state how many of the disputes resulted in you notifying the consumer reporting agencies to change the reporting status or balance of the account in question.

### INTERROGATORY NO. 3:

For each month or year since January 2003, state the total number of disputes received from the consumer reporting agencies which suggested in any manner that accounts which were discharged were not being reported accurately. For each time period, state how many of the disputes resulted in you notifying the consumer reporting agencies to change the reporting status or balance of the account in question.

### INTERROGATORY 4:

Please state whether you authorized Trans Union Corp., Trans Union LLC, Experian Information Solutions, Inc., and/or Equifax Credit Information Services, Inc., [collectively "their"] to report your consumer credit data on and by way of any or all of their credit reporting systems during the years, 2002, 2003, 2004, 2005, 2006, 2007 and 2008. If so, state whether you authorized Trans Union Corp., Trans Union LLC, Experian Information Solutions, Inc., and/or Equifax Credit Information Services, Inc., [collectively "their"] to report your data about Plaintiff on and by way of any or all of their credit reporting systems during the years, 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

### INTERROGATORY 5:

Please state the dates and exact contents of each reporting, which bore any of Plaintiff's personal identifiers, you made to any consumer reporting agency[ies] to which you subscribe[ed].

**INTERROGATORY 6:**

Identify all suits filed against you since 2002 alleging inaccurate or incorrect reporting of consumer accounts that were included in or discharged in bankruptcy to credit reporting agencies or to any other entity or person.

**INTERROGATORY NO. 7:**

Identify the names, addresses, and telephone numbers of all persons who were witness to or who have personal knowledge of any of the facts, events, or matters that are alleged in Plaintiffs' complaint, your answer, anticipated answer and/or defenses thereto and describe and explain your understanding of the matters on which the persons named have knowledge. In addition to identifying said individuals as specified in the instructions above, please include the following:

    (a)    Please state whether each such person is affiliated with, or related to, or employed by any party (or its agents, servants, officers, or employees) to this lawsuit;

    (b)    If any of the persons so listed in response to this interrogatory do not fit the characterization in subpart (a) above, please describe the nature of their involvement in this lawsuit;

    (c)    Please explain and describe your understanding of their knowledge of such facts.

**INTERROGATORY NO. 8:**

Identify all correspondence or documents that refer or relate to any correspondence or communication between you and any other individual or entity regarding the plaintiff, as well as any potential credit grantors or mortgage grantors relating or referring to the facts, acts, events, or matters alleged in Plaintiffs' complaint, or your answer, anticipated answer and/or defenses thereto.

**INTERROGATORY NO. 9:**

State all of the facts and describe all actions you took, including not limited to correspondence and communications with any consumer reporting agency, furnisher, creditor or potential creditor, with regard to or which in any way references the Plaintiff and/or any of his accounts.

**INTERROGATORY NO. 10:**

If any document that is or would have been responsive to Plaintiff's Requests for Production of Documents to you was destroyed, lost, mislaid, or otherwise missing, identify the document, state the date of and reason for its unavailability, and identify all persons having knowledge of its contents and/or the reason for its unavailability.

**INTERROGATORY NO. 11:**

If any document responsive to Plaintiff's Request for Production of Documents to you is withheld from production, identify each such document by date, title, subject matter, length and the request to which it is potentially responsive and state the reason for withholding production, and identify each person to whom the document was sent, shown, or made accessible, or to whom it was explained.

**INTERROGATORY NO. 12:**

State whether you have reported data to any consumer reporting agency concerning the Plaintiff's consumer reports which is inaccurate and, if so, state why such inaccurate information was placed on his consumer report(s), state the date(s) such report(s) was (were) issued, to whom the report(s) was (were) issued, and state what you could and should have done to prevent the inaccurate data from being reported on his/her/their consumer report(s).

**INTERROGATORY NO. 13:**

State your procedures (and identify all documents related thereto) designed to assure that you are reporting a consumer's account accurately before, during and after he or she has been discharged from bankruptcy.

**INTERROGATORY NO. 14:**

Please list, explain and describe documents known to you or believed by you to exist concerning any of the events described in Plaintiff's complaint or concerning any of the events which are the subject[s] of any defense[s] you have raised to this lawsuit.

**INTERROGATORY NO. 15:**

Please list, explain and describe each and every contact or communication you received from your any individual, entity, court or credit reporting agency which, in any way, referenced Plaintiff. This request would include any GEIS [General Electric Information Services]-based and E-Oscar communications, UDFs, AUDFs, CDVs, ACDVs, tape transfers, system to system transfers, phone calls and other means of communication.

**INTERROGATORY NO. 16:**

Please state whether you have reported any accounts of or related to the Plaintiff within the last five (5) years and, in connection with your response, please identify the recipients of such reports, the manner reported, the identifying data connected with the report, and explain and describe the manner and identifiers under which you received the information.

**INTERROGATORY NO. 17:**

Did you receive notice that the Plaintiff had filed bankruptcy and had included your account in Plaintiff's bankruptcy? If so, identify each and every notice you received from any source, including but not limited to, the Plaintiff, the bankruptcy court or any other source.

**INTERROGATORY NO. 18:**

Do you have a policy of not reporting or updating consumer information to the credit reporting agencies? If so, please do the following:
(a)     Please state said policy.
(b)     Please identify the title of the policy, stating the title of the Manual or Policy and procedure manual in which is located and the heading and page under which the policy can be found.

**INTERROGATORY NO. 19:**

Please identify and describe your policies and procedures for not reporting or keeping a consumer account from being updated to a credit reporting agency once a consumer has filed bankruptcy.

**INTERROGATORY NO. 20:**

Explain in detail why you updated the account after you received notice of the discharge and state whether this was consistent with your policies and procedures. Identify all such policies and procedures.

**INTERROGATORY NO. 21:**

Identify any and all parties, by name, address, and dates of ownership, that have owned this account and/or the right to receive payments made to this account, including but not limited to, any Trust, Master Trust, debt buyer, or securitized trust.

**INTERROGATORY NO. 22:**

Please describe how your computer backup systems function including the type of software used (including version), the hardware used (including manufacturer name and models) and how it works, including the tape rotation schedule, what happens when tapes are overwritten, and what data is backed up and from which device.

**INTERROGATORY NO. 23:**

State all procedures that are implemented when you receive a verifiable notice that a borrower has filed a petition for relief under the Bankruptcy code and provide a copy of all written policies addressing the same.

**INTERROGATORY NO. 24**:

State if you receive notice of a bankruptcy filing by any type of Electronic Bankruptcy Notification System (EBN) and if so identify the system, the type of notice received, how it is received, and how the information is then processed after receipt.

**INTERROGATORY NO. 25**:

State if the processes described in Interrogatory No. 22 are manual or automated and please explain in detail any and all procedures and protocols related to either the manual or automated processes.

**INTERROGATORY NO. 26**:

If you answer any Request for Admissions with anything other than an "Admitted", fully explain your response, identifying all documents and persons related to the response.

Respectfully submitted this the 14TH Day of **April, 2008**.

/s/ John G. Watts
**John G. Watts**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattslawgroup.com

/s/ M. Stan Herring
**M. Stan Herring**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 714-4443
(888) 522-7167 *facsimile*
msh@mstanherringlaw.com

**PLEASE SERVE WITH THE SUMMONS AND COMPLAINT**

FILED
7/... PM
C... 7.00
CIRCUIT COURT
...SON COUNTY,
...E MARIE ADAMS

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| **ASHLEY EDWARDS, an**<br>**individual,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| **v.** | )     **Civil Action Number:** |
| **NCO FINANCIAL SYSTEMS,**<br>**INC., a Corporation,** | )<br>)<br>) |
| **Defendant.** | )<br>) |

## PLAINTIFF'S FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS TO DEFENDANT

PLEASE TAKE NOTICE that you are hereby notified and required to respond to the following Requests For Production of Documents to Plaintiff herein, through Plaintiff's attorney of record, within the provisions the Alabama Rules of Civil Procedure.

You are further placed on notice that this discovery is continuing, requiring supplemental responses thereto in the event requested information or documents become available which would require amendment or supplementation of your responses in order that they would be proper and truthful, become known to you.

### INSTRUCTIONS

**ALL INFORMATION.** In answering this discovery, please furnish all information and documents which are available to you, including, without limitation, all documents in the possession of your attorneys, accountants, affiliates, auditors, agents, employees, officers, directors, shareholders, contractors, or other personnel, and not merely such documents as is in your own personal possession.

**DUE DILIGENCE.** If you cannot respond to any of the following requests and interrogatories in full, after exercising due diligence to secure documents and information to do so, please so state, and respond to the extent possible, specifying all reasons why you are unable or unwilling to respond to the remainder, stating whatever documents you have concerning the unproduced documents and undisclosed information, and what efforts you made to secure documents and information sufficient to allow you to respond fully to the particular request or interrogatory.

**OBJECTIONS:** If an interrogatory or request is objected to, in whole or in part, or if information responsive to an interrogatory or request is withheld, on the ground of privilege or

otherwise, please set forth fully each objection, describe generally the information which is withheld, and set forth the facts upon which Defendant relies as the basis for each such objection.

**OBLIGATION TO SUPPLEMENT**: This discovery is of a continuing nature and supplementary answers are to be filed upon your discovery that an answer is incorrect or incomplete.

**TIME FRAME**: Unless otherwise stated, each request pertains to the time period beginning **January 1, 2002**, through the present date. Thus, your responses should be fully answered as they pertain to information, recordings or documents within that time frame. Further, each request should identify the appropriate time frame, if your response requires the same.

## DEFINITIONS

**"Document"** shall refer to any mechanism of preserving or transmitting any information, whether it be written, printed, photographed, electronically or magnetically recorded or otherwise made and maintained.

**"Identify"** or **"describe"** when referring to a person, a firm, a corporation, or another entity shall mean to state the full formal name; the address of the principal place of business or residence; and the telephone number,

**"Identify"**, or **"describe"** when referring to a document shall mean giving a description of the title, the author, a description of the general subject matter and the identity and address of its present custodian.

**"Defendant(s),"** **"you"** means all agents, employees, representatives, investigators, and others who are in possession of or may have obtained information for or on behalf of the named party or parties defendant.

**"Personal Identifiers"** means a person's name or social security number or other unique data that identifies or is associated with a particular "person".

**"Plaintiff"** refers to Ashley Edwards.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    Please produce all documents involving communications between you and any of the other person or entity, in which the communication in any way referenced Plaintiff and/or any of his personal identifiers.

2.    Please produce all documents involving or constituting communications between you and the Plaintiff or anyone acting on or purporting to act on the Plaintiff's behalf.

3.    Please produce your policy manuals, procedure manuals, or other documents, which address your policies, practices, or procedures in reporting data to any consumer-

2

reporting agency, during each of the years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

4.  Please produce your policy manuals, procedure manuals, or other documents, which address your policies, practices, or procedures for altering previously reported data to any consumer-reporting agency or any other entity, during each of the years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

5.  Please produce your policy manuals, procedure manuals, or other documents, which address your policies, practices, or procedures for retention, dissemination, reporting of or disposal of account data, during each of the years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

6.  Please produce your policy manuals, procedure manuals, or other documents, which reference, constitute or duplicate the Fair Credit Reporting Act (or any part thereof) and its revisions or amendments provided to your employees, during each of the years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

7.  Please produce your policy manuals, procedure manuals, or other documents or video, which are provided to your employees or independent contractors concerning retention, alteration, correction, investigation, dissemination or disposal of data provided to any consumer reporting agency or any other entity or placed in any report during each of the years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

8.  Please produce your contract, documents, manuals, or other recorded data, concerning your subscriber relationships with the Credit Reporting Agencies, including but not limited to Equifax, Experian, and Trans Union.

9.  Please produce your documents which evidence, constitute and/or address your policies, procedures and guidelines for handling Consumer Disputes, including but not limited GEIS [General Electric Information Services]-based and E-Oscar communications, UDFs, AUDFs, CDVs, ACDVs, tape transfers, system to system transfers, phone calls, and other means, by whatever named called, of communication to any other agency, entity, consumer reporting agency or furnisher, in each of following years: 2002, 2003, 2004, 2005, 2006, 2007, and 2008.

10. Please produce all of your documents evidencing or including data concerning the names, addresses, telephone numbers, current employers, and current whereabouts of each one of your employees who communicated with Plaintiff.

11. Please provide a complete audit trail, by whatever named called, of any document(s), computer(s), or other data held by you that indicate, address, or discuss modifying or amending any information regarding Plaintiff reported by you.

12. Please produce all documents that constitute consumer dispute verification (CDV's), Universal Data correction forms, correspondence with any consumer reporting agency,

3

data deletion forms, or other documents that request an alteration and/or deletion of data you or any other defendant, individual or entity had reported about Plaintiff, which contained any one of Plaintiff's personal identifiers.

13.    Please produce your documents evidencing, referencing, constituting and/or containing your subscriber contracts, subscriber names, subscriber codes, personal identification numbers, reporting policies, means and procedures and/or access codes and specify what time periods such contracts, names, codes, personal identification numbers and/or access codes were used or made available to you by any party to this case.

14.    Please produce your documents and/or correspondence in your, or your attorney's, possession that refer to or relate to any facts which you believe may have any bearing upon this lawsuit or any defenses you have raised in this lawsuit, excluding letters between you and your attorney.

15.    Please produce copies of your documents evidencing telephone messages, logbooks, or other regularly maintained records by you that contain information about communications between you and Plaintiff and/or any other defendant in this action and/or any consumer reporting agency or furnisher or government bureau or any Better Business Bureau.

16.    Please produce all documents that refer in any manner to the Plaintiff or any of Plaintiff's accounts.

17.    Please produce copies of all disputes, whether received from consumers or credit reporting agencies, that suggested in any manner that accounts that were discharged were in any manner being reported incorrectly.

18.    Please produce all documents identified, relied upon or referred to or by you in your responses to Plaintiff's interrogatories.

19.    Please produce all agreements relating to sale of this account including future flow agreements.

20.    Please produce all agreements relating to sale of this account including but not limited to any forward flow agreement between this Defendant and any other company, including the original creditor. Please produce any bill of sale, any notice of assignment, any proof of claim, or any other documents evidencing or purporting to control the sale or transfer of this account between January 1, 2002, and the present.

21.    Please produce any and all pooling and servicing agreement(s) related to any forward flow agreement under whose terms this account was sold.

4

Respectfully submitted this the **14th** Day of **April,** 2008.

/s/ John G. Watts
**John G. Watts**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 879-2447
**(888)** 522-7167 *facsimile*
john@wattslawgroup.com

/s/ M. Stan Herring
**M. Stan Herring**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 714-4443
**(888)** 522-7167 *facsimile*
msh@mstanherringlaw.com

**PLEASE SERVE WITH THE SUMMONS AND COMPLAINT**

5



## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ASHLEY EDWARDS, an ) 
individual, )
  )
     Plaintiff, )
  )
v. )     **Civil Action Number:**
  )
NCO FINANCIAL SYSTEMS, )
INC., a Corporation, )
  )
     Defendant. )

### NOTICE TO TAKE DEPOSITION OF 30(b)(6) CORPORATE REPRESENTATIVE OF NCO FINANCIAL SYSTEMS, INC.

Take notice, that the Plaintiff will take the deposition of the following entities or individuals pursuant to Alabama Rules of Civil Procedure. The deponent(s) must bring all documents listed in this deposition notice and any attachments, and present the originals of these documents for inspection and copying at the deposition. The deposition will continue until completed.

**DEPONANT:**     **Corporate Representative of NCO Financial Systems, Inc.**

**DATE:**     **July 10, 2008**

**TIME:**     **9:00 a.m.**

**PLACE:**     **Watts Law Group, P.C.**
               **700 29th Street South, Ste 201**
               **Birmingham, AL 35233**

**Please note that pursuant to Alabama Rules of Civil Procedure 30(b)(5) & (6), this corporate Defendant must designate an individual(s) to testify as to the following matters:**

     1.     All allegations of fact stated in the complaint in this lawsuit.

     2.     All affirmative defenses asserted by the Defendant.

     3.     Whether or not Defendant's credit reportings to the major credit reporting agencies relating to Plaintiff were accurate.

     4.     Whether or not Defendant's credit reportings to the major credit reporting agencies relating to Plaintiff were accurate.

5.      Whether or not Plaintiff owes money to Defendant now.

6.      The policies, procedures and practices put in place by the Defendant to insure that the investigations or reinvestigations initiated by Plaintiff (whether directly to Defendant or through a CRA) would result in accurate credit reportings relating to Plaintiff.

7.      The definition of "accurate" and "verifiable" as those terms are used in Defendant's investigation or reinvestigation process.

8.      The nature and content of any records maintained by the Defendant--including archived copies and recorded conversations--relating to the reinvestigation of any trade lines appearing on Plaintiff's credit report.

9.      The number of reinvestigations of credit disputes handled by the Defendant on an annual basis and economic resources attributable to those reinvestigations.

10.     The existence and content of any reports or documents assessing the accuracy or reliability of credit reporting submitted by Defendant including any reports to or by the credit reporting agencies regarding the accuracy and reliability of those reportings.

11.     Any quotas or productivity targets for the Defendant's reinvestigators of credit disputes.

12.     Amount paid to and training provided to the employees responsible for reinvestigating disputed credit reportings made by the Defendant.

13.     The documents and informational resources available to the Defendant's employees who are responsible for reinvestigating disputed credit reportings made by the Defendant.

14.     The budgetary allocation of resources of the Defendant to reinvestigations of credit reporting disputes.

15.     The existence, nature, and content of any training provided to Defendant's employees or agents conducting reinvestigations.

16.     The nature, purpose, and means by which requests for reinvestigation are received and by which response may be made.

17.     The identity, content, and number of computer systems used to maintain data on consumers, their accounts, collections or applications and the access given to each of those systems.

18.     Scope of Defendant's employees' authority to correct credit reporting errors.

19.     The existence and content of any policy or procedure for handling credit reporting reinvestigations.

20.     The documents which are regularly maintained by the Defendant relative to any investigation or reinvestigation or credit reporting, and the content of those documents relative to the Plaintiff.

21.     The identity of any known witnesses to the allegations of fact stated in the complaint or the affirmative defenses asserted by the Defendant.

22.     The authenticity of any documents identified in any of the disclosures, pleadings, or discovery responses.

23.     The identity and expert credentials of any of the Defendant's employees or witnesses who were involved with or handled Plaintiff's account and/or any investigation or reinvestigation relative to Plaintiff's accounts.

24.     Identity of any person participating in the opening, servicing or handling of the transaction underlying this lawsuit (i.e. the account) or events surrounding it.

25.     Any communications between the Defendant and the Plaintiff relating to the investigation or reinvestigation of any credit reporting relating to the Plaintiff.

26.     Any releases or waivers signed by the Plaintiff.

27.     Any insurance or bonding carried by the Defendant, which may provide coverage for the allegations in Plaintiff's complaint.

28.     Whether or not the Plaintiff is a consumer as defined by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq* ("FCRA") at § 1681a(c).

29.     The existence of, date of and receipt of any credit applications from the Plaintiff.

30.     Whether or not the Defendant regularly furnishes credit information to any credit reporting agencies.

31.     The manner in which the Defendant reports or otherwise furnishes credit information to credit reporting agencies.

32.　The procedures in place at the Defendant to insure that false or inaccurate information is not reported on any consumer's credit report or to any credit reporting agency.

33.　Whether or not the Defendant has reported credit information relating to any of Plaintiff's personal identifiers including but not limited to name, address and social security number.

34.　The time, place, manner, and content of any reporting of credit information relating to any of Plaintiff's personal identifiers including but not limited to name, address and social security number.

35.　The format of the Defendant's credit reportings [e.g.] Metro or Metro II format.

36.　The content of each available data field or segment reported relating to any of Plaintiff's personal identifiers including but not limited to name, address and social security number.

37.　The capability of the Defendant's computer to reproduce records of past credit reportings to consumer reporting agencies.

38.　The policy, practice, and procedure relating to incomplete reporting of the available data fields or segments reported to credit reporting agencies.

39.　Whether or not Plaintiff disputed any credit information, supplied by the Defendant, which reportings related to any of Plaintiff's personal identifiers including but not limited to name, address and social security number and the contents of said dispute.

40.　Whether or not the Defendant received notice from any consumer reporting agency that Plaintiff disputed any credit information, supplied by the Defendant, which reportings related to any of Plaintiff's personal identifiers including but not limited to name, address and social security number and the contents of said dispute.

41.　The time and form in which such dispute was received, and the identity of any persons reviewing or acting on it.

42.　The time, place, and manner in which any actions were taken in response to any such notice.

43.　The steps and measures that were taken in the course of investigating or reinvestigating any credit information supplied by the Defendant, which credit information related to any of Plaintiff's personal identifiers including but not limited to name, address and social security number.

44.     The content of any information which was used in order to investigate or reinvestigate any credit reporting dispute by Plaintiff's of credit information supplied by the Defendant.

45.     The identity of any individual who participated in or supervised any investigation or reinvestigation of a credit reporting dispute by Plaintiff's of credit information supplied by the Defendant.

46.     The existence and nature of the legal relationship between the Defendant and any consumer reporting agencies to which it reports credit information.

47.     Any conditions under which the Defendant has agreed to make its data available to the any consumer reporting agency to which it reports credit information.

48.     Whether or not the Defendant's actions in relation to its reporting of credit data relating to the Plaintiff was willful.

49.     Whether or not the Defendant willfully failed in its duties to properly investigate or reinvestigate credit disputes sent by the Plaintiff to consumer reporting agencies.

50.     Whether or not the Defendant's actions in investigating or reinvestigating its credit reporting relating to the Plaintiff was willful.

51.     The motive and intent of the Defendant's actions in relation to its reporting and investigation or reinvestigation of the credit information relating to Plaintiff's personal identifiers.

52.     The accounts in question.

53.     All collection activities on these accounts.

54.     Document retention policy.

55.     Other suits filed since January 1, 2002, alleging similar conduct and the changes in policies that were made in response to each suit.

56.     Any forward flow agreements related to any account of Plaintiff.

Plaintiff hereby requests all deponents bring all documents responsive to and in support of the categories listed above and present the originals of these documents for inspection and copying at the deposition.

Respectfully Submitted,

/s/ John G. Watts
**John G. Watts**
**Attorney for Plaintiff**

**OF COUNSEL:**
Watts Law Group, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 879-2447
(888) 522-7167 *facsimile*
john@wattslawgroup.com

/s/ M. Stan Herring
**M. Stan Herring**
**Attorney for Plaintiff**

**OF COUNSEL:**
M. Stan Herring, P.C.
700 29th Street South
Suite 201
Birmingham, AL 35233
(205) 714-4443
(888) 522-7167 *facsimile*
msh@mstanherringlaw.com

**PLEASE SERVE WITH THE SUMMONS AND COMPLAINT**

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 5/88 | **SUMMONS**<br>**- CIVIL -** | **Case Number:**<br>01-CV-2008-901177.00 |
|---|---|---|

### IN THE CIVIL COURT OF JEFFERSON, ALABAMA
### ASHLEY EDWARDS v. NCO FINANCIAL SYSTEMS, INC.

**NOTICE TO**   NCO FINANCIAL SYSTEMS, INC., C/O THE CORPORATION CO 2000 INTERSTATE PARK DR, MONTGOMERY AL, 36109

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN WATTS

WHOSE ADDRESS IS P.O. Box 531168, BIRMINGHAM AL, 35253

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of   ASHLEY EDWARDS
pursuant to the Alabama Rules of the Civil Procedure

| 4/14/2008 7:23:37 PM | /s ANNE-MARIE ADAMS | |
|---|---|---|
| Date | Clerk/Register | By |

| ☑ Certified mail is hereby requested | /s JOHN WATTS |
|---|---|
| | Plaintiff's/Attorney's Signature |

**RETURN ON SERVICE:**

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____        _____
Date                                    Server's Signature

### 01-CV-2008-901177.00
### ASHLEY EDWARDS v. NCO FINANCIAL SYSTEMS, INC.

| C001 - ASHLEY EDWARDS | v.   D001 - NCO FINANCIAL SYSTEMS, INC. |
|---|---|
| Plaintiff | Defendant |

01-CV-2008-901177.00 D001

**SERVICE RETURN COPY**

02 1A
0004627 4
MAILED FROM




CERTIFIED MAIL

7007 3020 0000 7609 2012

Anne Marie Adams, Clerk
716 No Richard Arrington Jr Blvd
Room 400 JeffCo Courthouse
Birmingham AL 35203

NCO Financial Systems Inc
c/o The Corporation Co
2000 Interstate Park Dr
Montgomery AL 36109